1  Maria S. Bellafronto (State Bar No. 161994)
   mbellafr@hopkinscarley.com
2  Jedidiah L. Dooley (State Bar No. 240105)
   jdooley@hopkinscarley.com
3  HOPKINS & CARLEY
   A Law Corporation
4  The Letitia Building
   70 S. First Street
5  San Jose, CA  95113-2406

6  ***mailing address:***
   P.O. Box 1469
7  San Jose, CA 95109-1469
   Telephone:      (408) 286-9800
8  Facsimile:      (408) 998-4790

9  Attorney for Plaintiff JUDITH JENKINS

10              UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13  JUDITH JENKINS,                          CASE NO.  3:19-CV-08350-VC

14         Plaintiff                          **PLAINTIFF'S TRIAL BRIEF**

15    v.                                      Date:       November 15, 2021
                                              Time:        8:30 a.m.
16  JEFFREY WILLIAM TRUEMAN, an              Location:  San Francisco Courthouse,
    individual; JOHN BULLOCK, an individual; Courtroom 4, 17th Floor, 450 Golden Gate
17  JEFF BULLOCK, an individual; ALCOVE       Avenue, San Francisco, CA 94102
    MEDICAL, INC., a Utah corporation;        Judge:       Hon. Vince Chhabria
18  ALCOVE MANUFACTURING AND                              United States District Judge
    DISTRIBUTION, INC., a Utah corporation;
19  SCIENCE MEDICAL, LLC dba Blue Harbor     Date Action Filed:  December 20, 2019
    Medical, LLC, a Utah limited liability    First Amended Complaint Filed:  Nov. 3, 2020
20  company, and DOES 1 through 10, inclusive, Trial Date:  November 15, 2021

21         Defendants.

22

23

24

25

26

27

28

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

CASE NO. 3:19-CV-08350-VC

# I. <u>OVERVIEW OF THE CASE</u>

This action arises out of Defendants' fraudulent conduct surrounding Plaintiff Judith Jenkins' ("Jenkins" of "Plaintiff") $1 million investment in a startup company the Defendants formed called Science Medical, LLC ("Science Medical" or the "Company").  More specifically, in the summer of 2015, Ms. Jenkins was a single 67-year old woman who had just gone through a traumatic divorce with a very wealthy individual.  In the aftermath, while undergoing psychiatric care and counseling, Ms. Jenkins' new financial advisor, defendant Jeff Trueman ("Trueman"), approached her about investing in Science Medical.   The Company was formed by his high school friend, Jeff Bullock, along with his father, John Bullock, and was an investment *outside of* Merrill Lynch, where Trueman worked.  In order to entice her to invest, Defendants explained that Science Medical was an emerging company based out of Utah that provided a great investment opportunity for Ms. Jenkins with huge potential upside and the ability to "save lives" with a breathing device the Company developed and was in the process of getting patented with FDA approval.  In connection with the initial pitch, Trueman provided Ms. Jenkins with a 2014 business plan (the "Business Plan"), setting forth various financial projections, including demonstrating that the Company expected to earn almost $40 million in revenue by 2017.  Later, Defendants also explained that the Company was offering for sale disposable bed sheets for use in hospitals that similarly had a significant financial upside.  Based on the information Defendants provided to her, Ms. Jenkins made three separate investments in Science Medical in late 2015 and early 2016 totaling $1 million.

Despite her trust in Defendants, in particular defendant Trueman, her former financial advisor, Ms. Jenkins later discovered numerous material omissions and misrepresentations. In fact, there is no proof whatsoever that the Defendants ever provided any copies of the Company's Investor Suitability Questionnaire, Unit Purchase Agreement or Operating Agreement – documents they had in their possession and provided to the earlier investors from 2013.  In fact, there is *not one single document* signed by Ms. Jenkins demonstrating her understanding and acknowledgement of this type of risky investment for a single woman of her age.   Worse still, rather than using Ms. Jenkins' money to develop and market viable products described in their

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-2-

CASE NO. 3:19-CV-08350-VC

1   business plan, the Company's managers, the Bullocks, squandered all of her money – using it

2   primarily to pay themselves, along with their friends and family, over $700,000 in "consulting

3   fees."

4          Given the Defendants' fraudulent inducement of Ms. Jenkins, combined with the

5   Bullocks' breach of their fiduciary duties in running the Company, Ms. Jenkins has never seen

6   any return on her investment and her units in the Company are now worthless.  As a result, Ms.

7   Jenkins now seeks $1 million in damages, along with punitive and statutory damages.  Ms.

8   Jenkins also seeks to recover her attorney's fees by statute for her financial elder abuse.

9                              II.   ANALYSIS OF CLAIMS

10  A.      Plaintiff Will Prevail on Her Claims Set Forth In Her First Amended
           Complaint
11

12         1.      Ms. Jenkins' Claims for Securities Fraud

13         Ms. Jenkins has set forth causes of action for violations of federal securities laws (the

14  "10b-5 Claims"), violations of California Corporations Code section 25401 (the "Section 25401

15  Claim") and common law fraud related to her investment in Science Medical.  Based on the

16  substantial evidence collected through the discovery process, there is little doubt that Ms. Jenkins

17  will prevail on her fraud claims.   Indeed, is now evident that Defendants' fraud takes the form of

18  both numerous non-disclosures and material misrepresentations.[1]  Specifically, as far as

19  omissions, Defendants failed to disclose the following material facts (among others) in their

20  solicitation of Ms. Jenkins for her investment:

21       •   the Company had little to no working capital;

22       •   The Company had no actual purchase orders from hospitals or doctors to purchase
             the breathing device (despite the statement in the Business Plan that orders were
23           placed to purchase the devices from hospitals);

24       •   the Company had already burned through all of its prior $675,000 in investment
             funds from the other, initial, third party investors[2];
25

26       •   the Company had pivoted away from manufacturing the breathing device toward

27  ───────────────────
    [1] While it is beyond the scope of this trial brief to set forth all of the evidence relating to the
28  material misrepresentations, it is important demonstrate a few examples.
    [2] In fact, as set forth below, the Company had $0.05 in the bank account just before Ms. Jenkins

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

530\3846881.1
PLAINTIFF'S TRIAL BRIEF                          -3-

CASE NO. 3:19-CV-08350-VC

making disposable linens;

- several other disgruntled third party investors had been complaining about the Bullocks' lack of transparency over the Company's financials and operations;

- the Company never had a viable, FDA approved, product to sell; and

- the Company was on pace to lose hundreds of thousands of dollars in 2015 alone.

Most troubling, Plaintiff will demonstrate that one month after Ms. Jenkins' first $200,000 investment and *before she invested another $800,000,* the Company received a "cease and desist" letter from Fisher & Paykel, its supplier of a material component part (the humidifier) of the breathing device.   This letter demanded that the Company no longer use its part, because the breathing device as a whole was not FDA approved.  The Defendants admit they failed to notify any single investor, including Ms. Jenkins, that the Company received this "cease and desist" letter.  As a result, nobody knew that the Company's supplier of the humidifier had effectively ended any ability of Science Medical to sell the breathing device.[3]  In fact, when specifically asked about communications with Ms. Jenkins, Mr. Bullock responded as follows:

> **Q.** Answer my question -- the question pending, sir, is: Is there anything in writing that you're aware of from Science Medical to Judi Jenkins explaining to her what happened with respect to this September 28th, 2015, letter from Fisher and Paykel?

> **A.** I -- I -- I don't know.

Even as to the *basic investment documents* such as a Suitability Questionnaire, the Company's Operating Agreement or Unit Purchase Agreement, Defendants were unable to provide any signed copy from Ms. Jenkins or provide any actual evidence (other than their own self-serving recollection) that Ms. Jenkins was given such legally required documents.

Another critical omission relates to the Defendants' failure to disclose the Company's accurate financial condition in 2014-2015.  For example, Mr. Trueman, Science Medical's CFO, admitted that he concealed from Ms. Jenkins that Science Medical had spent all of the prior

---

invested her initial $200,000 payment in August 2015.
[3] Notably, Plaintiff was never able to question Mr. Trueman about this communication, because the Bullocks concealed it until after Mr. Trueman's deposition was taken when it was ultimately produced.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

530\3846881.1                                    -4-
PLAINTIFF'S TRIAL BRIEF

CASE NO. 3:19-CV-08350-VC

investors' money and only had $0.05 in its bank account at the time of her first investment:

> **Q:** Did you tell Judi that the company only had a nickel in the bank before she put her $200,000 in to invest.
>
> **A:** I don't think so.
>
> **Q:** So did you make any representation to Judi Jenkins before she invested money her money into Science Medial about how much money the company had –
>
> **A:** No.
>
> **Q:** -- in cash.

Yet, the Business Plan the Defendants provided to Ms. Jenkins, dated May 2014, stated that the Company's assets included *over $2.5 million in cash* for FY2015. *See* Tr. Exh. 61. In fact, the Business Plan contained numerous other material misrepresentations. For example, it stated that the company would be generating over $5.8 million by the end of 2015. *Id.* However, the reality was by the end of 2015, Science Medical had spent all of the investor money raised ($675,000) with no product ready to sell that could create any revenue stream, let alone the millions of dollars projected. The Business Plan also represented that Science Medical was going to make millions of dollars by selling the device to many hospitals, stating that "our first verbal purchase order is with The Methodist Hospital in Houston, TX and should start producing revenue by July." That claim, however, proved to be false once Ken Hargett, the Director of Respiratory Care at the Methodist Hospital, testified that *the hospital was never going to purchase any breathing device from Science Medical because hospitals had no use for them.* In fact, Mr. Hargett told the Defendants that the target market for the breathing device was *home-care companies,* not hospitals:

> **Q.** Do you recall if you had any conversations with Jeff or John Bullock about the Houston Methodist Hospital purchasing the Breathe-EZ device?
>
> **A.** I knew it was brought up, because they were looking for potential markets, but the Breathe-EZ is a home-care device and not a hospital device, so Methodist wouldn't have been interested

Hopkins & Carley
Attorneys At Law
San Jose ◆ Palo Alto

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-5-

CASE NO. 3:19-CV-08350-VC

in purchasing it.

**Q.** So it wasn't a device that Houston Methodist would have used?

**A.** Not for in-patients, no.

\*        \*        \*

**Q.** Do you recall if you ever made any suggestions about other hospitals or business entities that would be interested in purchasing the Breathe-EZ device?

**A.** I told them that home-care companies would be their best bet, and actually put them in touch with one of the local home-care companies.

Given the many material misrepresentations and critical omissions, Plaintiff is confident that she will prevail on her 10b-5 Claims, Section 25401 Claim, and common law fraud claims.

### 2.        Ms. Jenkins' Claims for Breach of Fiduciary Duty

There is no dispute that the Bullocks were managing members of Science Medical.  *See* Tr. Exhs. 51, 121.  There can also be no dispute that as managers, the Bullocks owed all members of Science Medical, including Jenkins, a fiduciary duty.  *See* Utah Code Ann. § 48-3a-409.

At trial, Ms. Jenkins will be able to unequivocally demonstrate that the Bullocks breached that fiduciary duty and improperly spent Ms. Jenkins' $1 million investment.  In fact, after receiving her initial investment, the first thing Defendants did was write checks to themselves – not use the money to continue to develop products.  *See* Tr. Exh. 49, 50.

Moreover, Trueman, an officer in the Company, sent a number of candid emails detailing the grossly negligent and self-serving manner in which the Bullocks managed Science Medical.  For example, in an October 2016 email, Trueman tells the Bullocks that he cannot figure out where Ms. Jenkins' money went or what the Company has to show for it:

In the last year we have almost gone through $1 million and I'm not sure what we have to show for it. My guess is we are going to need to raise more money, but before we do we really need to audit the last years expenses. Where did it all go?

*See* Tr. Exh. 231.  The answer to Trueman's question is that the money was almost all spent on "consulting fees" paid to the Bullocks and Trueman, himself.   Dan Ray, Plaintiff's forensic accountant, will testify that despite minimal sales of the Company and cumulative net losses of

Hopkins & Carley
Attorneys At Law
San Jose ♦ Palo Alto

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-6-

CASE NO. 3:19-CV-08350-VC

1    more than $2 million, nearly $1 million of consulting payments were made with nearly $700,000
2    paid to the individual Defendants.  Other employees of Science Medical will likewise testify that
3    despite engaging in an audit, they too were unable to determine how Ms. Jenkins' funds were
4    spent.  Tellingly, despite numerous employees' concerns, the Bullocks never performed any audit
5    of the Company's financials.
6
7           By the next month, in November 2016, Trueman wrote the Bullocks stating that: (i) he
8    "fundamentally disagree[d] with the way the company has been run," citing improper proposed
9    uses of investor funds; (ii) Jeff Bullock's "salary was outrageous for a pre-revenue company;"
10   (iii) over $300,000 of Ms. Jenkins' invested money could not be accounted for and "there still
11   isn't a business;" and (iv) Jeff Bullock was frequently "dishonest" with investors and employees.
12   *See* Tr. Exh. 314.  Further, John Bullock, the other managing member, did nothing to step in and
13   correct the situation.  Rather, he was content to cash his Company checks and completely ignore
14   the improper manner in which his son was running the Company and wasting investor funds.
15   Simply put, the evidence with demonstrate that the Bullocks breached their fiduciary duties.
16
17
18              **3.      Ms. Jenkins' Cause of Action for Financial Elder Abuse**
19
20          California's Welfare & Institutions Code section 15610.30 is known as the Elder Abuse
21   and Dependent Adult Civil Protection Act (the "Act").   The Act broadly defines financial abuse
22   as occurring when "a person or entity... [t]akes, secretes, appropriates, obtains, or retains real or
23   personal property of an elder ... for a wrongful use or with intent to defraud, or both" or "by
24   undue influence." [*Bounds v. Superior Ct*., 229 Cal. App. 4th 468, 478 (2014) (citing Cal. Welf.
25   & Inst. Code § 15610.30 (a)(1)-(3)].  "Further, a person or entity that assists in the foregoing
26   conduct is also liable for elder abuse." *Id*.  An elder is defined as someone over the age of 65.  *Id*.
27          The parties all agree that Ms. Jenkins was an elder when she made her investments in
28   Science Medical.  Moreover, as set forth above, the evidence at trial will overwhelmingly
     demonstrate that Defendants obtained Ms. Jenkins' money with an "intend to defraud" (and, at a

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-7-

CASE NO. 3:19-CV-08350-VC

period of time when she was particularly vulnerable.)[4]  Therefore, Ms. Jenkins will prevail on this cause of action as well.

### 4. Ms. Jenkins' Claims for Alter Ego Against The Alcove Defendants

At trial, it will be shown that Science Medical, Alcove Manufacturing & Distribution, Inc., and Alcove Medical, Inc. (the "Alcove Defendants") are all one in the same and that the Alcove Defendants should be liable for any judgment against Science Medical.   Indeed, the entities were operated and controlled by the same individuals – the Bullock family.  Moreover, not only was there common ownership between Science Medical and the Alcove entities, but the Alcove entities paid the debts of Science Medical.  As Trueman testified, "The company itself didn't have bankroll, but they also had Alcove Medical which could continue to fund their operation." Further, the Company was not properly capitalized.  Jeff Bullock, the CEO, initially formed Science Medical by making a capital investment of only $50. Thereafter, his father John Bullock, the COO, made a capital contribution via a series of small payments totaling $4,620.[5]  All of the other capital that was infused in the Company came from the external investors.  Despite the significant amount of investment funds contributed, $1,634,365 as of December 31, 2017 (including Plaintiff's $1 million), Science Medical was technically insolvent for a number of year-end periods due to the Company having its liabilities exceeding its assets and having negative equity.  Further still, at trial, it will be shown that the Alcove Defendants and the Company commingled funds, the Company never paid any distributions, and the Company failed to adhere to numerous corporate formalities.  In fact, Jeff Phipps, Science Medical's interim CFO who later purchased Alcove Medical and Alcove M&D, testified that the Alcove Defendants and Science Medical were all "pretty much the same business" – sharing the same principals and same address, with Jeff Bullock taking money from the Alcove Defendants "whenever he wanted" to pay Science Medical debts.

### B. Defendants' Defenses Lack Legal and Factual Support

### 1. Ms. Jenkin's Inability to Testify Does Not Preclude Her From

---

[4] In fact, Mr. Eckley, Ms. Jenkins' appointed GAL, testified that he told Trueman on several occasions that Ms. Jenkins was having cognitive difficulty, was paranoid and did not fully appreciate how much money she had.
[5] Yet, collectively, the Bullocks owned a 76% interest in the Company.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-8-

CASE NO. 3:19-CV-08350-VC

### Prevailing on Her Claims

To date, the Defendants' main defense has been that Ms. Jenkins will be unable to prove her claims due to her inability to testify.  Specifically, Defendants have claimed that she will be unable to demonstrate the element of "reliance" for her fraud claims if she does not testify. Defendants' position, however, is wrong because they ignore binding authority establishing that Ms. Jenkins is entitled to <u>an inference</u> that she relied on any material facts that Defendants failed to disclose.  *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Binder v. Gillespie*, 184 F.3d 1059, 1063-64 (9th Cir. 1999).  Likewise, to the extent that Ms. Jenkins sets forth false representations of material fact, and she acted consistent with reliance upon such representations, then the jury may infer that Ms. Jenkins relied upon the misrepresentations.  *See Occidental Land, Inc. v. Superior Ct.*, 18 Cal. 3d 355, 363 (1976); *Vasquez v. Superior Ct.*, 4 Cal. 3d 800, 814 (1971); *Engalla v. Permanente Med. Grp., Inc.,* 15 Cal. 4th 951, 977, 938 P.2d 903 (1997), as modified (July 30, 1997).  Even without the inference of reliance, Plaintiff can establish reliance based on the circumstantial evidence presented demonstrating that she relied upon the Defendants' misrepresentations in deciding to invest her $1 million in the Company.

Further, and beyond the inferences to which Ms. Jenkins is entitled, as set forth above, Plaintiff will be able to provide evidence at trial that numerous material facts were omitted from any presentation.  As a result, any belief that Ms. Jenkins will be unable to prove her fraud claims without her testimony are severely misplaced.

### 2. Ms. Jenkins' Designation as an "Accredited Investor" Does Not Excuse Defendants' Fraud

Throughout this litigation, as if they were carrying a "golden ticket," the Defendants have argued that Ms. Jenkins was an "accredited investor," thereby insinuating that that such a designation unmistakably demonstrates she was a sophisticated investor.  At trial, however, the evidence will demonstrate that Ms. Jenkins was not a "sophisticated investor."  While she did have approximately $6 million in assets at the time of her initial investment, *her money stemmed from her ex-husband who was a partial owner of the San Francisco Giants baseball team*.  In fact, her ex-husband controlled their assets and made all of their investments through their prior

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

530\3846881.1

-9-

PLAINTIFF'S TRIAL BRIEF

CASE NO. 3:19-CV-08350-VC

1  financial advisor at Merrill Lynch (before Merrill Lynch appointed Trueman as Plaintiff's

2  replacement advisor after their divorce).  Notably, as Mr. Eckley will explain, during her

3  marriage, she did not have any oversight or responsibility for their financial investments.

4  Moreover, as Defendant's own expert, Jarred Parish, testified, being an accredited

5  investor simply means that Ms. Jenkins had a certain amount of assets or level of income:

6  **Q.** So you believe Judy was an accredited investor?

7  **A.** I believe that Judy met the definition of accredited investor.

8  **Q.** What's that definition?

9

10  **A.** There are two definitions.  Either a million dollars in assets,
   excluding principal residence, or for an individual, gross income of
11  $200,000 for the previous two years and an expectation of a similar
   income level for the following year, and for a married couple, joint
12  couple -- which isn't relevant here -- 300,000 under the same
   parameters.

13

14  It had nothing to do with her sophistication, as Mr. Parish will also explain:

15  **Q.** And they don't have to demonstrate any amount of
   sophistication in order to become an accredited investor, separate
16  and apart from their net worth and income?

17  **A.** Correct.  They don't need to have any experience or training or
18  certification.

19  Furthermore, regardless of Ms. Jenkins' purported "sophistication" (by virtue of her status as an

20  accredited investor), she was entitled to full disclosures of all material facts and should not have

21  been duped into investing by Defendants' misrepresentations.  As a result, any claim by

22  Defendants that Ms. Jenkins should have uncovered the numerous material facts that were

23  omitted or saw through the misrepresentations due to her sophistication will be unavailing.

24  **3.       The Bullocks' Defenses Are Not Legally Supportable**

25  In an effort to absolve themselves of liability, the Bullocks have set forth several legal

26  defenses; none of which are availing.  For example, the Bullocks have taken the position that by

27  pleading violations of California Corporations Code section 25401, Ms. Jenkins is precluded from

28  recovering on her common law fraud claim.  However, it is well established that a claim under

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

530\3846881.1                                    -10-
PLAINTIFF'S TRIAL BRIEF

CASE NO. 3:19-CV-08350-VC

section 25401 does not preempt California's common law cause of action for fraud.  *See Bowden v. Robinson*, 67 Cal. App. 3d 705, 717 (1977) ("By enacting this law, the Legislature 'established a carefully drafted series of actions and remedies that supplement common law actions, remedies and limitations'.").  As a result, there is nothing that precludes Ms. Jenkins from pursuing her cause of action based on common law fraud, in addition to her Section 25401 Claim.

Additionally, the Bullocks claim they cannot be held liable for aiding and abetting because "no implied private right of action exists against the alleged aiders and abettors."  While that may be true as to 10b-5 claims, it is not true when Ms. Jenkins' aiding and abetting claim is based on her common law fraud claims.  There can be no credible dispute that aiding and abetting common law fraud is a well-recognized cause of action, and any claim that Ms. Jenkins' Fifth Cause of Action fails as a matter of law is spurious at best.[6]  *See Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2005) ("California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort").

Likewise, while the Alcove Defendants claim that this Court does not have personal jurisdiction over them, the Alcove Defendants waived any defense based on personal jurisdiction by failing to raise it in their responsive pleading.  *See* Dkt. No. 66; Fed. R. Civ. P. 12(h).  Indeed, "as a general rule, if a party files a responsive pleading or makes a Rule 12 motion but does not raise personal jurisdiction as a defense, the party waives the right to raise personal jurisdiction later."  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1008 (N.D. Cal. 2014).  Therefore, this defense fails as well.

Dated: September 28, 2021

HOPKINS & CARLEY
A Law Corporation

By:

Maria S. Bellafronto
Jedidiah L. Dooley
Attorneys for Plaintiff Judith Jenkins

---

[6] Notably, no defendant chose to file any dispositive motion on this ground.

Hopkins & Carley
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

530\3846881.1
PLAINTIFF'S TRIAL BRIEF

-11-

CASE NO. 3:19-CV-08350-VC